IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANSYS, INC.,                 )
                                  )
             Plaintiff,          )
                                    )    Civil Action No. _____
         v.                   )
                                    )
GREGORY S. FALLON,         )
                                    )
            Defendant.       )

## VERIFIED COMPLAINT

Plaintiff ANSYS, Inc. ("ANSYS" or the "Company") by and through its undersigned counsel, Buchanan Ingersoll & Rooney PC, files the within Verified Complaint against Defendant Gregory S. Fallon ("Fallon").

## I. INTRODUCTION

1.     This is an action by ANSYS to secure equitable relief and damages against Fallon, a former employee, for his breach of his Intellectual Property Protection Agreement ("Agreement") with ANSYS (attached as Exhibit A) and for his misappropriation of ANSYS' trade secrets and competitively sensitive information, thereby allowing him to unfairly and unlawfully compete with ANSYS.

2.     Fallon was employed by ANSYS and its predecessor company for over 17 years.

3.     In his last role at ANSYS, Fallon held the Director of Strategic Marketing Programs position with responsibility for understanding and executing ANSYS' overall offensive marketing strategy, and setting the playbook for ANSYS' strategy to beat the competition in the engineering software industry.

4.     This strategic role required Fallon to access and analyze the following confidential and valuable information: (a) ANSYS' financial information, (b) its customer and

sales information, including both ANSYS' historic sales strategies and future sale plans, (c) its products' strengths and weaknesses, (d) its view of its competition, (e) the key people that ANSYS has trained and plans to use to further its growth objectives, and (f) the strategic initiatives that ANSYS is marketing externally and internally in its one, three and five year plans. *Id.*

5.      On Monday, September 8, 2014, after 17 years with ANSYS and its predecessor company with access to sensitive trade secret information, Fallon resigned from ANSYS.

6.      Fallon notified his immediate manager, Joshua Fredberg ("Fredberg"), Vice President of Marketing, that he landed a new "really big job" with a larger, publicly-traded company, Autodesk, Inc. ("ADSK"), which also markets and manufactures software in direct competition with ANSYS.

7.      In fact, ADSK identifies ANSYS as a direct competitor in its own FORM 10-K filing with the United States Securities and Exchange Commission ("SEC"), relevant portions of which are attached as Exhibit B.

8.      Specifically, ADSK states in the "Competition" section: "Our primary global competitors in the PSEB, AEC and MFG segments include Adobe Systems Incorporated, **ANSYS, Inc.**, AVEAN Group plc, . . . ." Ex. B, p.18.

9.      ADSK's recruiter described Fallon's new ADSK position as the number two position in the manufacturing organization reporting to the Senior Vice President of the business unit, responsible for $500 million in revenue and with a team of 200 employees. *See* ADSK Recruiter Email at Exhibit C.

10.     Attached as Exhibit D is the job description for Fallon's Vice President of Mechanical Design position; Fallon described the role to Fredberg as "running ADSK's simulation business."  (Simulation software is the type of software made and sold by ANSYS.)

11.     Fallon cannot work for ADSK, managing its simulation software business, without calling upon the highly confidential, trade secret information that he developed and acquired during his employment with ANSYS and in violation of his confidentiality and non-compete obligations.

12.     Fallon knows his obligations under his Agreement, but he has chosen to ignore those obligations, unfairly and unlawfully exploiting ANSYS' trade secrets for his own personal advantage.

13.     Fallon's actions in accepting ADSK's Vice President of Mechanical Design position are knowing, willful, unfair, and will continue unless they are stopped by an Order of the Court.

14.     As long as Fallon works for ADSK during the 12-month period following his separation from ANSYS last week, ANSYS is being irreparably harmed, suffering injury that cannot be quantified in monetary terms.

## II. PARTIES

15.     ANSYS, a Delaware corporation, develops, markets and supports engineering simulation software on a global basis.

16.     From ANSYS' humble beginnings in 1970 in Western Pennsylvania, it has grown to support 2,700 professionals with its headquarters at 275 Technology Drive, Canonsburg, Pennsylvania, including more master's and Ph.D.-level engineers than any other simulation software provider in the world.

17.     ANSYS is a unique employer with a strong commitment to innovation and research and development efforts, constantly seeking to improve its software and expand its use.

18.     Fallon is an individual residing at 31 Low Road, Hanover, New Hampshire 03755.

19.     Beginning in 1996, Fallon worked for Fluent, Inc. subject to a Confidentiality Agreement, and that Confidentiality Agreement was amended in 2006, after ANSYS acquired Fluent and Fallon became employed by ANSYS.

20.     In 2011, in exchange for a Long-Term Retention Bonus ("Bonus") in the amount of $24,000 Fallon signed the Agreement, agreeing to its confidentiality, non-compete, and non-solicitation terms.  That Bonus was in addition to his annual salary, other bonuses, incentive stock options and other benefits.  Fallon received the first $12,000 of his Bonus on June 30, 2014.

### III. JURISDICTION

21.     This Court has jurisdiction over this civil action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and this matter is between citizens of different states, Pennsylvania and New Hampshire respectively.

22.     This Court has personal jurisdiction over Fallon.

23.     The Agreement Fallon executed with ANSYS states:

Any legal proceedings arising under or relating to this Agreement will be instituted **solely in the federal or state courts maintaining jurisdiction over Washington County, Pennsylvania**.  I consent to the venue and jurisdiction of such courts, and I submit to the personal jurisdiction of such courts and knowingly and voluntarily waive all objections to being sued in such courts.

Exhibit A, ¶16 (emphasis added).

24.     Additionally, this Court has personal jurisdiction over Fallon because he has the required minimum contacts with this forum to establish personal jurisdiction.

25.     Specifically, Fallon interacted with his manager, Fredberg on an almost daily basis, and worked closely with the Vice President of Industry Strategy Marketing and the Director of Product Management, all of whom are based out of ANSYS' Canonsburg, Pennsylvania headquarters.

26.     In addition to almost daily emails, telephone conversations and online conferences with his co-workers at Southpointe, Fallon also traveled to ANSYS' headquarters for meetings, and some meetings were multiple days, such as his two weeks spent in 2012 at the Canonsburg headquarters as part of the ANSYS' Leadership Program, a training program provided to a select few of ANSYS' up-and-coming managers.

27.     Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391(2) because Fallon and ANSYS have agreed that this judicial district has jurisdiction over claims arising out of or relating to Fallon's Agreement.

28.     In sum, the events giving rise to ANSYS' claims against Fallon arise out of events in and impacting Canonsburg, Pennsylvania, with the key witnesses and documents located in the Western District of Pennsylvania (at Southpointe).

## IV.  <u>FACTUAL BACKGROUND</u>

### A.     <u>ANSYS' BUSINESS</u>

29.     The engineering software industry is a highly competitive, global marketplace.

30.     ANSYS develops and globally markets engineering simulation software and services widely used by engineers, designers, researchers and students across a broad spectrum of industries and academia.

31.     ANSYS focuses on the development of open and flexible solutions that enable users to analyze designs directly on the desktop, providing a common platform for fast, efficient

and cost-conscious product development, from design concept to final-stage testing and validation.

32.     ANSYS distributes its suite of simulation technologies through a global network of independent resellers and distributors and direct sales offices in strategic, global locations. *See* relevant excerpts of ANSYS 10-K at Exhibit E.

33.     To stay current, companies within the industry, including ANSYS, are continually making acquisitions, improving their technology, responding to changing customer needs, and investing in obtaining information about the marketplace, including customers' needs, responses to their products, and experimenting with ways to increase growth.

**B.      ANSYS' EMPLOYMENT OF FALLON CENTERED ON FALLON'S STRATEGIC USE AND DEVELOPMENT OF ANSYS' TRADE SECRET INFORMATION.**

34.     ANSYS initially acquired Fluent, a computational fluid dynamics software company in 2006, and in conjunction with that acquisition, it hired Fallon.

35.     Until his resignation, Fallon worked as the Director of Strategic Marketing Programs based in Lebanon, New Hampshire.

36.     In that role, Fredberg relied upon Fallon to lead ANSYS' corporate-level programs, its industry marketing efforts, and its product-level marketing campaigns and work with management in different areas of ANSYS to implement these programs efforts and campaigns.

37.     This required Fallon to work closely with ANSYS' sales executives and managers, including its Regional Vice Presidents for Sales for North America, Asia-Pacific and Europe, and understand ANSYS' sales volume, revenue, challenges and successes, including by regions, by products, and by customers.

38.     This sales information was communicated to Fallon, who traveled internationally for ANSYS, meeting with its sales leaders, channel managers and field representatives.

39.     Fallon also attended the North American Sales quarterly business review and helped prepare confidential information for that meeting, updating the sales leaders with competitive information about the market and ANSYS to increase sales.

40.     Fallon had access to ANSYS' Siebel Customer Relationship Management ("CRM") data and used it to generate various types of reports.  The login page states: "You are about to access CONFIDENTIAL, PROPRIETARY, and TRADE SECRET INFORMATION of ANSYS, Inc.  Unauthorized use or disclosure of this information to persons or entities outside of ANSYS, Inc. is strictly prohibited and may be subject to penalties under the Uniform Trade Secrets Act and other laws."

41.     The CRM provided Fallon with specific information on ANSYS' customer relationships on both macro and micro level, including, by way of example, every single order placed worldwide through ANSYS' direct sales force, as well as its indirect distributors, also known as Channel Partners.

42.     Fallon designed and implemented ANSYS' marketing programs and campaigns, including the measurement system used to track the success of such programs.

43.     In other words, Fallon understood and helped develop the targets of the expected generated revenue based upon specific investment into each marketing project as well as the weekly scorecards of the actual results of those marketing projects and related revenues.

44.     To develop the strategic marketing campaigns, Fallon was intimately familiar with ANSYS' financial information, which he had access to and was responsible for evaluating and understanding.

45.     In addition to sales and marketing strategies, Fallon had responsibility for market intelligence information, including information about technical product information (e.g., what improvements users were requesting to certain products), about sales, market trends and competitive products.

46.     Fallon acquired this market intelligence both internally at ANSYS (through its analysts, sales leaders, technical leaders, and work with other Directors as well as Vice Presidents) and externally through the consultants that ANSYS hired through Fallon.

47.     For example, in his last six months before his resignation, Fallon purchased information from multiple consultant companies costing thousands of dollars.

48.     ANSYS invested in resources to provide Fallon the market knowledge so that others senior management could leverage that knowledge in execution of their leadership roles.

49.     Fallon also worked closely with Fredberg on strategic reports that very few high-level ANSYS management employees had access to about ANSYS' overall growth strategies ("Executive Strategy Reports").

50.     These Executive Strategy Reports, like the one prepared in January 2014, was marked "ANSYS Proprietary and Confidential Information" and specifically identified competitive trends and competitive scenario analysis as well as ANSYS' view of its competition (including ADSK).

51.     Fallon also created quarterly reports for certain senior and executive management employees describing ANSYS' current business with detailed insights into its successes and challenges.

52.     Fallon cannot deny that these quarterly reports are restricted and highly confidential.  They are labeled: "ACCESS TO THIS FILE IS RESTRICTED TO ANSYS

SENIOR MANAGEMENT TEAM AND THEIR DESIGNEES ONLY.  This content highly confidential and may not be reused or shared."

53.    The last such report that Fallon created was in July 2014, and based on emails from the ADSK recruiter, it was during the time frame that Fallon was in the midst of discussions with ADSK, a direct competitor, about his now new role, leading its simulation business.

54.    Additionally, Fallon worked closely with the Vice President of Industry Strategy Marketing at ANSYS to create overall growth strategy, with the resulting document targeted to an extremely limited audience based on the confidentiality of the business vision contained within it.

C.    **FALLON WAS A HIGHLY-COMPENSATED DIRECTOR.**

55.    For his development of ANSYS' strategic marketing and related initiatives, ANSYS highly compensated Fallon.

56.    For example, in 2013, he received base salary of $157,684.50, bonuses in the amount of $26,000.00, and other benefits, including reimbursement of expenses for his global travel for ANSYS.

57.    Likewise, in 2014, he received a base salary of $163,203.00, bonuses in the amount of $27,000.00, 1,000 Restricted Stock Units, and other benefits, including reimbursement of expenses for his global travel for ANSYS.

58.    In addition to this compensation, ANSYS invested in Fallon, selecting him to participate in its ANSYS Leadership Academy, Class of 2012, providing him with marketing budget funds to expend on consultants and market intelligence, and supporting his efforts to build key relationships in the industry outside of ANSYS.

59.     On September 8, 2014, Fallon resigned his employment and asked ANSYS to waive the non-competition obligations in his Agreement, as he was resigning for employment with ADSK, a direct competitor.

60.     That same day, following his resignation announcement, Fallon informed a peer that he had received assurances from ADSK that his signing bonus from ADSK would be far greater than any legal fees generated during the instant litigation to enforce his valid non-compete.

**D.   FALLON'S AGREEMENTS WITH ANSYS ARE TO PROTECT ANSYS' INTELLECTUAL PROPERTY AND TRADE SECRETS.**

61.     ANSYS required Fallon to sign certain agreements because he had access to and used confidential and proprietary business information, and it desired to protect that valuable, non-public information.

62.     ANSYS takes measures through its use of non-disclosure agreements, confidentiality agreements, stock option agreements, and intellectual property protection agreements, as well as labeling information as confidential and using passwords to ensure that employees understand their obligations.

63.     On May 1, 2006, Fallon entered into an amendment to the Fluent Confidentiality Agreement to make clear his confidentiality obligations to ANSYS as well as other post-employment obligations.

64.     On August 25, 2011, as Fallon's strategic role under Fredberg increased and he played a greater role in owning the market intelligence, assisting with strategic initiatives, and analyzing and compiling sensitive sales and financial information, ANSYS and Fallon entered into a new Agreement, that supersedes his Fluent agreement.  *See* Exhibit A.

65.     In the Agreement, Fallon acknowledged that he read it carefully, had an opportunity to review it with advisors of his choice, understood it, and agreed to abide by its terms completely.  *Id.*

66.     Fallon agreed that Pennsylvania law would govern the Agreement without giving effect to Pennsylvania's principles of conflicts of law.  *Id.* at ¶ 16.

67.     The Agreement made clear that ANSYS "aggressively invests in research and development, routinely dedicating a significant percent of its revenues to proprietary, trade secret innovation and technology development, and is consistently developing proprietary advancements to its software and technologies . . ."  *Id.* at ¶ 1.

68.     Based on ANSYS' investments into trade secrets information and its providing Fallon with access to it, Fallon had to agree not to disclose any of ANSYS' Intellectual Property except as required to perform his job duties while employed by the Company.  *Id.* at ¶ 3.

69.     Fallon agreed to a one-year non-competition provision and acknowledged it was reasonable that he not work for a business with activities which compete with ANSYS' core business of Engineering Simulation Software.  *Id.* at ¶ 7.

70.     Specifically, Fallon's Agreement contains the following provision in relevant part:

<u>Non-Compete</u>.  While I am employed by the Company and for one (1) year after my employment terminates, I will not, directly or indirectly, whether as employee, owner, partner, shareholder, co-venturer, consultant, agent or otherwise, work, engage, participate, consult or invest in any business activity anywhere in the world which develops, manufactures or markets products or performs services that are competitive with the products and/or services of the Company, or products and/or services that the Company has under development or that are subject to active planning at any time during my employment, including without limitation, business activities which compete with the Company's core business of Engineering Simulation Software ("Competitor").

            *                              *                              *

The restrictions set forth in this Section 7 are intended **to protect the Company's interest in ANSYS Intellectual Property and Confidential Information and**

**established customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose.** I acknowledge that the restrictions set forth in this Section 7 do not preclude me from finding employment or other gainful economic opportunities in the fields of professional engineering, or non-engineering software.

*See* Exhibit A, ¶ 7 (emphasis added).

71.     Similarly, on November 20, 2006, November 15, 2007, November 14, 2008, November 15, 2010, November 14, 2011, and November 14, 2012, Fallon was offered and executed Stock Option Agreements that provided Fallon with the opportunity to receive certain incentive compensation in exchange for restrictive covenant obligations.

72.     Under the Stock Option Agreements, Fallon agreed to pay ANSYS all gains from all ANSYS' stock options he exercised if he engaged directly or indirectly, within one (1) year of his termination of employment, in any of the following:

(a)     The development, marketing, solicitation, or selling of any product or service that is competitive with the products or services of ANSYS, or products or services that ANSYS has under development or that are subject to active planning at any time during your employment;

(b)     The use of any ANSYS confidential or proprietary information, copyrights, patents or trade secrets which was acquired by you as an employee of ANSYS; and/or

(c)     Any activity for the purpose of inducing, encouraging, or arranging for the employment or engagement by anyone other than ANSYS of any employee, officer, director, agent, consultant, or sales representative of ANSYS, or attempt to engage any of them in a manner that would deprive ANSYS of their services or place them in a conflict of interest with ANSYS.

*See, e.g.,* reference to November 14, 2012 Stock Option Agreement in September 9, 2014 Letter at Exhibit F.

73.     The non-competition provision of his Agreement makes clear that Fallon could not work for ADSK for the one year following his resignation from ANSYS.

74.     Fallon is also obligated to pay ANSYS for any gains realized under his Stock Option Agreements for violating the express non-competition provisions contained in the Agreement.

75.     These gains are approximately $306,091.

**E.     FALLON PLANS TO WORK FOR A DIRECT COMPETITOR AND ACCEPTS THE NEW VICE PRESIDENT POSITION.**

76.     On June 11, 2014, ADSK's recruiter contacted Fallon about the Vice President Mechanical Design position.  Exhibit B.

77.     Upon information and belief, subsequent to that email, Fallon had discussions with the ADSK recruiter and with the Senior Vice President at ADSK to whom he would report, Robert "Buzz" Kross, in Portland, Oregon.

78.     Upon information and belief, subsequent to those discussions and while working on highly confidential projects for ANSYS during this same time frame, Fallon interviewed with ADSK in Oregon, which is where he is apparently planning to move.

79.     While contemplating working for ADSK, in August 2014, Fallon attended and participated in ANSYS' highly confidential, four-day Annual Planning Meeting for the global Marketing Department.

80.     During the August 2014 Annual Planning Meeting, Fredberg and key members of his Department, discussed and established their recommendations for the overall marketing plan, including the strategic programs, to be given to the Senior Management team of ANSYS for their consideration and approval.

81.     Certain sales leaders also attended the Annual Planning Meeting to provide specific information from their regional vantage points and to help impact strategy for certain regions and products.

82.     This August 2014 meeting is but one example of Fallon's gain of competitive information about how ANSYS views the competition and the market, as well as its marketing strategies to beat the competition in 2015.

83.     These include new initiatives by ANSYS, as well as confidential business changes, which are currently not known outside of ANSYS and would be valuable to the competition, such as ADSK.

84.     Despite his contractual and statutory confidentiality obligations, on September 8, 2014, Fallon communicated to Fredberg the news about his "really big job" leading the simulation business at ADSK.

85.     On September 9, 2014, ANSYS' Vice President, General Counsel and Secretary, Sheila DiNardo notified Fallon that ANSYS would not waive his post-employment non-competition obligations. *See* September 9, 2014 Letter at Exhibit F.

86.     In the letter, DiNardo also reiterated Fallon's contractual obligations to ANSYS. *Id.*

87.     Fallon requested a couple of vacation days on September 8, 2014, and he was permitted to take vacation on September 9 and September 10.

88.     On Wednesday, September 10, 2014, Fallon and Fredberg spoke again, and Fallon stated that he would not return to work based upon his lawyer's advice.

89.     Shortly after that call, Fallon's termination was effective September 10, 2014, and his exit interview was planned for Friday, September 19, 2014.

**F.     FALLON HAS MADE CLEAR HIS INTENT TO BREACH HIS AGREEMENTS WITH ANSYS AND MISAPPROPRIATE TRADE SECRET INFORMATION.**

90.     Fallon is well aware of his knowledge of ANSYS' confidential, trade secret information discussed above that he will not be able to set aside when working for ADSK, his obligations under his Agreement, and ADSK's competition with ANSYS in software simulation.

91.     Fallon assisted ANSYS by including information about ADSK in confidential analysis related to its competitors, ANSYS' view of them, and strategies to win customers from them.

92.     Just as ANSYS acquired Fluent in 2006 for its computational fluid dynamics capabilities; ADSK acquired Blue Ridge Numerics, Inc. in 2011, touting its "Digital Prototyping to provide customers with a spectrum of computational fluid dynamics (CFD) capabilities that help automate fluid flow and thermal simulation decision-making designs . . . ."  Exhibit B, p. 23.

93.     Fallon emailed the President and CEO about his Agreement as well as seeking clarification from the Vice President, General Counsel and Secretary about Paragraph 10 of the Agreement.

94.     Paragraph 10 of the Agreement allows Fallon to receive his monthly salary for six (6) months while he abides by the one-year term of his non-compete agreement.

95.     Fallon has indicated that he desires to proceed with his exit interview and to work for ADSK.

96.     Fallon cannot work for ADSK in the Vice President role with a strategic focus without inevitably sharing ANSYS' trade secrets and misappropriating them.

97.     By virtue of Fallon's knowledge and access to ANSYS' information and working for ADSK, Fallon will misappropriate ANSYS' confidential and proprietary information and trade secrets to unfairly compete with ANSYS.

98.     If Fallon is not stopped, he and ADSK will benefit from ANSYS' trade secrets at ANSYS' expense.

99.     Fallon and ADSK will be provided with an unfair, unearned and unwarranted competitive advantage.

100.    At this point, it is unclear how much of ANSYS' Proprietary Information Fallon has used and disclosed, but Fallon must be stopped so that he does not continue to irreparably harm ANSYS through its misappropriated confidential and proprietary information.

101.    Fallon cannot work for ADSK in the Vice President role with a strategic focus without inevitably sharing ANSYS trade secrets and misappropriating them.

102.    By virtue of Fallon's knowledge and access to ANSYS' information and working for ADSK, Fallon will misappropriate ANSYS' confidential and proprietary information and trade secrets to unfairly compete with ANSYS.

103.    If Fallon is not stopped, he and ADSK will benefit from ANSYS' trade secrets at ANSYS' expense.

104.    Fallon and ADSK will be provided with an unfair, unearned and unwarranted competitive advantage.

105.    At this point, it is unclear how much of ANSYS's confidential, proprietary information Fallon has used and disclosed for his and/or ADSK's benefit, but Fallon must be stopped immediately so that he does not continue to irreparably harm ANSYS through its misappropriated confidential and proprietary information.

106.     Once Fallon provides ANSYS' keys to the kingdom in terms of it specific marketing and sales strategies for product lines in various regions and what has and has not worked for ANSYS, it will be  impossible to quantify the damage to ANSYS caused by such a confidentiality breach.

**E.**     **ANSYS IS ENTITLED TO A TEMPORARY RESTRAINING ORDER.**

107.     ANSYS is likely to succeed on the merits of this case because it has a valid, enforceable Agreement with Fallon, it has legitimate business interests to protect, and Fallon's breach of the Agreement is open, blatant and obvious.

108.     ANSYS' customer relationships, goodwill, market share, business opportunities, competitive advantage, proprietary information, and relations with its remaining employees will be irreparably harmed if a temporary restraining order, a preliminary injunction and a permanent injunction are not entered.

109.     ANSYS will suffer far greater harm if a temporary restraining order granting preliminary injunctive relief and a permanent injunction are not granted than Fallon will suffer if they are granted.  Indeed, Fallon will suffer no harm but will simply be ordered to honor the promises he made, and he will be paid half of his annual salary during the one-year non-compete period.

110.     Granting a temporary restraining order, including a preliminary injunction, would serve the public interest.

**COUNT I**
**Breach of Contract**

111.     ANSYS incorporates by reference Paragraphs 1 through 103 of the Complaint as if the same were set forth in full herein.

112.    The Agreements are valid, enforceable contracts supported by adequate consideration were voluntarily and knowingly entered into by Fallon.

113.    Fallon breached (and continues to breach) the Agreements.

114.    The restrictions contained in Fallon's Agreements are reasonably limited to protect ANSYS' legitimate business interests.

115.    Fallon's knowing, willful and intentional breach of the Agreements has caused – and will continue to cause – immediate and irreparable harm to ANSYS, as well as causing it to suffer other compensatory damages.

## COUNT II
### Violation of the Pennsylvania Uniform Trade Secrets Act

116.    ANSYS incorporates by reference Paragraphs 1 through 108 of the Complaint as if the same were set forth in full herein.

117.    Fallon is a "person" as defined by the Pennsylvania Uniform Trade Secrets Act ("PUTSA") codified at 12 Pa. Cons. Stat. Ann. § 5301 *et seq.*

118.    ANSYS possesses valuable trade secrets, and confidential and proprietary business information.

119.    ANSYS has spent significant time and money developing its trade secrets and confidential and proprietary business information.  It has also taken steps to protect this information from disclosure.

120.    Disclosure of this type of information to ANSYS' competitors would undermine ANSYS' competitive position in the marketplace.

121.    Fallon had access to ANSYS' trade secrets, and its confidential and proprietary business information.

122.     Since leaving ANSYS, Fallon has misappropriated, misused and likely disclosed such information for his economic advantage.

123.     Fallon's conduct is willful, intentional, malicious, unprivileged, and in bad faith and has caused (and will continue to cause) immediate and irreparable harm to ANSYS, as well as causing it to suffer other compensatory damages.

124.     Pursuant to Sections 5303-5305 of the PUTSA, ANSYS is entitled to injunctive relief, double damages and affirmative relief to ensure the protection of its trade secrets, an award of reasonable attorneys' fees, exemplary damages, and/or other appropriate relief.

## COUNT III
## Unfair Competition

125.     ANSYS incorporates by reference Paragraphs 1 through 117 of the Complaint as if the same were set forth in full herein.

126.     Fallon, by engaging in the conduct described above, has engaged in unfair competition with ANSYS.  His conduct of misappropriating ANSYS' information has caused (and will continue to cause) damage to ANSYS' goodwill, customer relationships, prospective customer relationships, contractual relationships, and valuable business interests.

127.     Fallon's conduct has been (and continues to be) willful, intentional, and unprivileged and has caused (and will continue to cause) ANSYS to suffer immediate, irreparable harm, as well as other compensatory damages.

128.     Fallon's conduct, as described above, is contrary to honest industrial and commercial practices.

## PRAYER FOR RELIEF

WHEREFORE, ANSYS respectfully requests this Court enter an order:

1.     Enjoining Fallon, preliminarily and then permanently, from:

    (a)    misappropriating or disclosing or making available to any person or any entity the confidential information, trade secrets and proprietary information of ANSYS as defined by the Agreements and the Pennsylvania Uniform Trade Secret Act;

    (b)    possessing any confidential information, trade secrets or proprietary information of ANSYS as defined by the Agreements and the Pennsylvania Uniform Trade Secret Act;

    (c)    remaining in the employ of ADSK or going to work for any other Competing Business of ANSYS pursuant to his Intellectual Property Protection Agreement for a one-year period from the date of this Court Order; and

    (d)    unlawfully competing with ANSYS in violation of ANSY'S Intellectual Property Protection Agreement.

2.    Requiring Fallon to verify by affidavit his return of all of ANSYS' confidential information and trade secrets as defined by the Agreement and the Pennsylvania Uniform Trade Secret Act.

3.    Awarding ANSYS compensatory damages, including pre- and post-judgment interest.

4.    Awarding ANSYS its $306,091.06 based on Fallon's obligations under the Stock Option Agreements.  *See* Fallon's Total Gains of $306,091.06 at Exhibit G.

4.    Awarding ANSYS punitive damages and/or double damages pursuant to 12 Pa. Cons. Stat. Ann. § 5304 for Fallon's willful, intentional and malicious conduct.

5.    Awarding ANSYS all costs and expenses in connection with this action, including its reasonable attorneys' fees pursuant to 12 Pa. Cons. Stat. Ann. § 5305.

6.      Awarding any other relief as the Court may deem to be just or appropriate.


Dated:  September 16, 2014                    Respectfully submitted,

                                              BUCHANAN INGERSOLL & ROONEY PC


                                              By: *s/ Jaime S. Tuite*_____
                                              Jaime S. Tuite, Esquire (PA #87566)
                                              jaime.tuite@bipc.com
                                              Bethany C. Salvatore, Esquire (PA #206322)
                                              bethany.salvatore@bipc.com
                                              One Oxford Centre, 20th Floor
                                              301 Grant Street
                                              Pittsburgh, PA 15219-1410
                                              Phone: (412) 562-8800
                                              Facsimile: (412) 562-1041

                                              Attorneys for Plaintiff,
                                              ANSYS, Inc.

## VERIFICATION

I, Joshua Fredberg, Vice President Marketing, am authorized to execute this verification on behalf of ANSYS. I have read the foregoing Answers to the Verified Complaint and I believe it to be true and correct to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

Dated: September 16, 2014

Joshua Fredberg