IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

ANSYS, INC.,

PLAINTIFF

VS.                              CIVIL ACTION NO. 14-1271

GREGORY S. FALLON,

DEFENDANT

_____


PROCEEDINGS

    Transcript of HEARING ON MOTION FOR TRO AND PRELIMINARY
INJUNCTION, commencing on FRIDAY, SEPTEMBER 26, 2014, AT
12:00 P.M., in the United States District Court, Sixth Floor,
U. S. Post Office and Courthouse Building, Pittsburgh,
Pennsylvania, before the HONORABLE ARTHUR J. SCHWAB, UNITED
STATES DISTRICT COURT JUDGE.

APPEARANCES:

For the Plaintiff:  By:  Jaime Tuite, Esquire
                         Bethany Salvatore, Esquire
                         Buchanan, Ingersoll & Rooney
                         One Oxford Centre, 20th Floor
                         Pittsburgh, Pennsylvania 15219


For the Defendant:  By:  Alice S. Johnston, Esquire
                         Obermayer, Rebmann,
                             Maxwell & Hippel
                         BNY Mellon Center, Suite 5240
                         Pittsburgh, Pennsylvania 15219

                         Katherine Perrelli, Esquire
                         Seyfarth Shaw
                         World Trade Center East
                         Two Seaport Lane, Suite 300
                         Boston, Massachusetts   02210

2

```
1

2

3   Reported by:              Sandra Wenger, FCRR, RMR
                             Official Court Reporter
4                            Fifth Floor, U.S. Courthouse
                             Pittsburgh, Pennsylvania 15219
5                            412.261.6254

6   Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2        FRIDAY AFTERNOON SESSION, SEPTEMBER 26, 2014, 12:00 P.M.

 3                    P R O C E E D I N G S

 4                         -  -  -

 5            (Whereupon, the following was had in open Court.)

 6            THE COURT:  Good afternoon.  This is the time and

 7   places that's been set for conference on the motion for TRO

 8   and preliminary injunction filed in 14-01271.

 9            I would ask counsel for the plaintiffs to enter your

10   appearance, please.

11            MS. TUITE:  Jamie Tuite, Your Honor, on behalf of

12   Ansys.

13            THE COURT:  Behalf the defendant?

14            MS. PERRELLI:  Kate Perrelli, Your Honor, on behalf

15   of defendant, Mr. Fallon.

16            MS. JOHNSTON:  Alice Johnston, from Obermayer, on

17   behalf the defendants.

18            THE COURT:  Welcome.  As I'm sure you figured out,

19   I have a jury that's out, currently, and I have a criminal

20   matter I have to handle at one o'clock.  So, that sort of

21   gives us the time frame.

22            So, I read everything and I have a couple questions.

23   Were you able to resolve any portion of the case today?

24            MS. PERRELLI:  Your Honor, Defendant Mr. Fallon

25   came prepared to talk about it, has made some suggestions, but
```

1    there was no interest.

2              THE COURT:  Okay.

3              MS. TUITE:  Your Honor, while given the nature of

4    the proposal, we need to -- we do not conceive of a way in

5    which Mr. Fallon can be working at Autodesk and not be using

6    the trade secrets at issue.

7              THE COURT:  And what's the name of the new employer?

8              MS. PERRELLI:  Autodesk.

9              THE COURT:  That's what I saw in the agreement.  So,

10   I just wanted to make sure I understood.  So, I've got some

11   questions.  First of all, would you describe what his job was?

12   What the defendant's job was at the plaintiff?

13             MS. TUITE:  Yes.

14             THE COURT:  You want pull the microphone in front of

15   you so we can hear?

16             MS. TUITE:  Mr. Fallon's job was the director of

17   strategic marketing programs at Ansys, Inc.  And as Your Honor

18   can see, this is his LinkedIn profile where he describes

19   himself as having a unique combination of sales, and

20   marketing, and engineering experience, where he was one of the

21   high potential leaders.  And that as part of his job was to

22   increase the revenues, which is very much what Mr. Fallon was

23   responsible for doing.

24             He had a marketing intelligence team under him,

25   Your Honor, and he would work with the sales leaders, with the

1  sales managers, as well as with his boss, the vice president

2  over the entire marketing organization of, approximately,

3  a hundred and twenty people, to help come up with strategy to

4  increase the revenue, and the customer base, and the sales of

5  the software.

6  THE COURT:  When did his employment officially end?

7  In other words, when did his medical coverage end and other

8  coverage end?

9  MS. TUITE:  Your Honor, I believe that the, that

10  occurred on Wednesday, September 10.  It was on September 8

11  that he called Josh Fredberg and made him aware that he was

12  planning to resign.  There was subsequent communications by

13  him with the CEO, as well as with Sheila DiNardo.

14  Mrs. DiNardo had sent the letter on September the ninth to

15  alert him that Ansys was not going to waive his non-compete.

16  There was then further correspondence from

17  Mr. Fallon on September 10 that indicated that he was

18  considering, that he had not appreciated the fact that Ansys

19  was willing to pay for him to sit out for a six-month time

20  frame.

21  THE COURT:  And the answer to my question is?

22  MS. TUITE:  September 10, Your Honor.

23  THE COURT:  So, you believe that from September 10

24  to the present, he's had no medical coverage?

25  MS. TUITE:  I'm sorry, Your Honor.  The -- I believe

1    that on September 10 is when the termination occurred.  I

2    believe that the benefits for Ansys would extend through the

3    end of the month.

4             THE COURT:  So, he's currently still under the

5    medical policies and everything of plaintiff; correct?

6             MS. TUITE:  Correct, Your Honor.

7             THE COURT:  Do you agree with that, ma'am?

8             MS. PERRELLI:  Yes.  Yes, sir.

9             THE COURT:  So, currently, he is not receiving any

10   benefit from the potential new employer, Autodesk; correct?

11            MS. PERRELLI:  That is correct Your Honor.

12            THE COURT:  When was the, when's the start date at

13   Autodesk?

14            MS. PERRELLI:  The current start date is the

15   thirteenth of October.

16            THE COURT:  Okay.  What's he doing for medical

17   coverage during those two weeks, between the end of September

18   and beginning of October?

19            MS. PERRELLI:  Your Honor, I believe he's planning

20   on doing COBRA.

21            THE COURT:  Thank you.  Just wanted to make sure he

22   and his family, if any family, had coverage during the

23   applicable period of time.

24            Where did he physically live while he was working

25   for Ansys?

1    MS. TUITE:  He lived in New Hampshire.  I don't have

2 the  --

3    THE COURT:  Hanover?

4    MS. PERRELLI:  Yes, Your Honor.

5    THE COURT:  Will he have to move for the new

6 employment?

7    MS. PERRELLI:  Yes, Your Honor.

8    THE COURT:  To where?

9    MS. PERRELLI:  To Portland, Oregon.

10    THE COURT:  Ma'am, I got some questions for you.

11 So, the employment agreement which the individual defendant

12 signed with Ansys, which is filed at Document No. 1-1, does he

13 admit that that's his document and his signature?

14    MS. PERRELLI:  Yes, Your Honor.

15    THE COURT:  And what, briefly, because I'm going to

16 give you more time to talk about this, what's his argument as

17 to why it's not enforceable?

18    MS. PERRELLI:  Couple reasons, Your Honor.  Few

19 reasons.  Number one, we would, we don't believe there is

20 sufficient consideration for the agreement.  This, as you can

21 notice from the date on, in the first paragraph of the

22 agreement, the last sentence says, in consideration of and as

23 a condition of my receipt of a long term retention bonus award

24 in April of 2011.  He signed this agreement on August 25,

25 2011.  It's our position that, and quite evident from the

1   document, that this was a benefit he had already received.

2   The grant of the bonus, anyway.  He was then not paid the

3   bonus until three years later.

4        THE COURT:  Prior to his resignation?

5        MS. PERRELLI:  Correct.  One-half of the bonus was

6   paid prior to, to his resignation.

7        THE COURT:  Okay.

8        MS. PERRELLI:  In addition to that, and, perhaps,

9   a longer answer, which I'm sure we will get to a little bit

10  later, as well, we think the breadth of the non-compete is

11  overbroad.

12       THE COURT:  Under what law?  Pennsylvania law?

13       MS. PERRELLI:  Pennsylvania law.

14       THE COURT:  Why?

15       MS. PERRELLI:  Because it, in effect, if applied as

16  written, it would put him out of his business that he's been

17  in in the last seventeen years.

18       THE COURT:  So, when he signed and acknowledged the

19  restrictions set forth in Section 7 did not preclude him from

20  finding employment or other gainful economic opportunities,

21  that was not truthful when he signed that?

22       MS. PERRELLI:  Well, Your Honor, it was truthful

23  when he signed it.  Of course.  But as it's being applied in

24  the context in which it is being applied, which I believe has

25  to be examined to determine whether it is tailored to protect

1    Ansys' business interests, as the position he's going to, this

2    is not, this is not achieving those interests or necessary to

3    those interests.

4            THE COURT:  Help me.  It's one thing to say the

5    document's too broad.  It's another thing to say that the

6    document is proper, but the job he's going to doesn't violate.

7    Are you arguing both or picking?

8            MS. PERRELLI:  Yes.

9            THE COURT:  Both?

10            MS. PERRELLI:  Yes.

11            THE COURT:  And his new employer knew about the

12    agreement before they offered him the employment; correct?

13            MS. PERRELLI:  I believe they did.  Yes, Your Honor.

14            THE COURT:  And did you provide legal advice to

15    Autodesk about whether or not to hire this gentleman?

16            MS. PERRELLI:  I did not, Your Honor.  I can't

17    answer you whether the firm did, but I don't believe, I don't

18    believe that was the case.

19            THE COURT:  Now, just, obviously, --

20            MS. PERRELLI:  We represent Autodesk.

21            THE COURT:  Obviously, if they sought your advice

22    prior to this, that would be interesting on having practiced a

23    lot in this area and often knowing clients only call you

24    after, not before.  I was just trying to figure out.

25            MS. PERRELLI:  I don't believe they were involved.

I don't know that for sure.

THE COURT:  If his, if his employment at Autodesk was not going to be a violation of the non-compete agreement, then why did Autodesk ask Mr. Fallon to seek a waiver of the agreement?

MS. PERRELLI:  I think Mr. Fallon, and we addressed this in, in his affidavit.  He sought it out of an abundance of caution, wanted to transition well with Ansys, and that's evident in the communication he had with the CEO.  He didn't believe, and stated and his discussions, I believe, with Mr. Fredberg, as well as with the CEO communication, as well, he did not believe it was a competitive position.

THE COURT:  Okay.  You may have up to fifteen minutes to present any argument or information that you would like to on behalf of the plaintiff.

And then, ma'am, I'll give you equal amount of time to argue on behalf of the defendants.

MS. TUITE:  Thank you, Your Honor.  I would like to address the four prongs of the test in order to receive a preliminary injunction.

THE COURT:  Any time someone says that, I just think about shrimp for some reason.  I don't know.  My mind just goes to some fish dish at that point.  But I guess that's -- so, you're going to talk about the four tests.

MS. TUITE:  Yes, Your Honor.  I apologize.  My

1    Power Point just went out.

2         THE COURT:  Oh, well, that's a blessing.  Have you

3    read former Secretary of Defense Gates' book on duty?

4         MS. TUITE:  No, Your Honor.

5         THE COURT:  I encourage you to do it or you can

6    listen to it.  It runs thirty-two hours if you want to listen

7    to it, but his view of Power Points is very interesting.  So,

8    I just encourage you.  Maybe you could search the whole thing

9    to, maybe search the whole thing to find the Power Point.

10        Yes ma'am.

11        MS. PERRELLI:  Your Honor, I am sorry to interrupt.

12   This is the first time I've seen it.  I'm sure it's fine, but

13   would it be all right just to take a look it?  We sat together

14   for two hours and --

15        MS. TUITE:  Your Honor, I was planning on just

16   flipping through this in front of Your Honor.

17        THE COURT:  Fine.  I'll just read it on the screen.

18        MS. TUITE:  So, in terms of the first prong, I think

19   it is important --

20        THE COURT:  First test?

21        MS. TUITE:  Excuse me.  First test.  Not prong.

22        THE COURT:  Good.

23        MS. TUITE:  So, the first test, Your Honor, I think

24   it's important to focus on what business that Ansys is in and

25   introduce you a little bit to Ansys.  This is a company that

is in the software simulation, one of the largest engineering
simulation software company in the world.  It, in fact,
invests aggressively hundreds of millions of dollars in its
intellectual property.  Because of this investment, it is
necessary for it to have these types of agreements with its
employees so that it can protect that trade secret
information.

Mr. Fallon, on his LinkedIn account, holds himself
out as the global director of strategic marketing programs at
Ansys.  He holds himself out as having the high potential
leadership qualities, which we don't disagree with.  He
reported to Joshua Fredberg, who was the direct, who was the
vice president of marketing, with a hundred and twenty
marketing employees underneath him, approximately.  And
Mr. Fallon was his right-hand man.

He was his confidante.  He was his go-to person for
when he needed to get the industry trends, the key customer
accounts, the information that mattered, and needed to be fed
to the strategic committee of the executive board of
directors.  In this role, Mr. Fallon, who had been promoted in
2010, ended up having, essentially, the keys to the kingdom
that you will hear about.

But before pulling him in and giving that much
information, he -- Mr. Fallon already had an agreement with
Fluee (Spelled phonetically.), which is the company that was

1    acquired by Ansys.

2           And the reason that I'm sharing this with you, Your

3    Honor, is it's important to understand how competitive this,

4    this industry is and how, in order to stay ahead and to be a

5    world leader in simulation software, you have to be targeting

6    the proper product, and purchasing them at the right time, at

7    the right price, in order to expand your customer base.  And

8    Greg Fallon was, he became privy to these and he ended up

9    getting the offer.

10          THE COURT:  Little slow, please.

11          MS. TUITE:  Sorry.  He was given the offer of the

12   long term retention bonus.  That was in exchange for him

13   entering into the intellectual property protection agreement.

14          This is an agreement that he did, in fact, sign and

15   that is binding.  That leads to the first factor, Your Honor,

16   which is the likelihood of success on the merits.

17          Here, because we have a breach of contract claim

18   and we have a contract that was entered into, in which

19   consideration was provided, Mr. Fallon admits that he received

20   the thirteen thousand dollars.  And would he have stayed with

21   Ansys, he would have received the rest of that long term

22   retention bonus of, approximately, twenty-four thousand

23   dollars.

24          THE COURT:  Okay.  Focus in on the timing, on the

25   signing of the agreement, and on the consideration issue.

1        MS. TUITE:  The agreement was signed on August 25,

2   2011, Your Honor.  The long term retention bonus award was in

3   April of 2011.  Mr. Fallon was made aware that in order to

4   get that long term retention bonus, he had to sign the

5   intellectual property agreement.

6        THE COURT:  Is there a document showing that?

7        MS. TUITE:  I don't have that, Your Honor.

8        THE COURT:  Is there a document showing that?

9        MS. TUITE:  But I believe that there is.

10       THE COURT:  All right.  Go ahead.

11       MS. TUITE:  In terms of the agreement that is at

12  stake here, he has an enforceable non-compete at least under

13  Pennsylvania law.  And the, the cases represent that you need

14  to have it be reasonable in terms of its timing and in terms

15  of its geography.

16       Here, the timing of it, one year, is routinely

17  upheld.  The global scope of it is necessary because

18  Mr. Fallon did work on a global level.  He was involved in

19  European marketing strategy.  He went to France for three

20  months in order to work on that.  He worked on Asia marketing

21  strategy.  He would be familiar with, with the overall breadth

22  of it.

23       Additionally, what counsel phrased earlier, the fact

24  of this clause being too broad, this is, this is a typical

25  clause in Pennsylvania in terms of its breadth.  It's limited

1    to competitive products.

2          And so, as you can see, Your Honor, that is going to

3    be the key issue in this case, as to whether or not Autodesk

4    and Ansys are competitors.

5          Your Honor, we would suggest that you can take

6    Autodesk's word for that.  We would suggest that when Autodesk

7    filed its Form 10K with the SEC that it is accurate.  It

8    specifically lists among its competitors Ansys, Inc.

9          We also think that you can take the words of the

10   person who would be the boss of Mr. Fallon, if he is allowed

11   to go and be the vice president of simulation at Autodesk,

12   that person is Buzz Cross.  Buzz Cross has publicly said

13   repeatedly that Autodesk is no longer just a CAD company.

14         This is publicly available information that we cite

15   to Your Honor in terms of what Mr. Cross has represented and

16   his point that the scope of the solution is equal to Ansys.

17   And in that role, he's also stated that Ansys is a competitor

18   and that Autodesk Software now does everything theirs does.

19         And our point here, Your Honor, is that Autodesk

20   has invested, at least according to what Mr. Cross has said,

21   a half a billion dollars in its simulation industry and in

22   simulation software.  And, in that role, it is already and

23   continuing to grow to be and it is a competitor of Ansys.

24         The other big key issue that we would submit, Your

25   Honor, is the trade secrets.  So, while we think that we will

1    succeed on the breach of contract claim, because we have a

2    valid contract with consideration and also with it having a

3    reasonable one year, just to prevent him from being able to

4    compete, we also submit that we will be successful on proving

5    under the Pennsylvania Human Trade Secrets Act that Mr. Fallon

6    was a substantial threat in his new role, as the vice

7    president of simulation, to use the trade secrets of Ansys.

8            THE COURT:  Excuse me for one moment.  He has to

9    sign a new agreement with the new employer.  Has that been

10   signed, yet; do you know?

11           MS. PERRELLI:  He has a non-disclosure agreement,

12   Your Honor.  He has no non-compete.

13           THE COURT:  Was a copy of that attached to those

14   affidavits?

15           MS. PERRELLI:  No, Your Honor.

16           THE COURT:  Do you have a copy of that document?

17           MS. PERRELLI:  He hasn't started, yet.  He hasn't

18   signed.  He has an offer letter that he signed.

19           THE COURT:  That's not going to be enforceable under

20   Pennsylvania law in that situation.

21           MS. PERRELLI:  Okay.  Apparently, he signed it.

22           THE COURT:  We don't have a copy here?

23           MS. PERRELLI:  We do not.

24           THE COURT:  Okay.  You may continue, ma'am.

25           MS. TUITE:  In terms of some of the different

1   presentations that show the trade secrets that are at issue,

2   Mr. Fallon, the slide that I have up now, Your Honor, is a

3   competitive deep dive.  This was one of the strategy

4   presentations that Mr. Fallon helped to put together.  This

5   was for the strategy committee of the board of directors of

6   Ansys.

7          So, he was gathering up information from the secret

8   software about sales and from the information that he would

9   have from his market intelligence team to synthesize and

10   process and to help Joshua Fredberg be able to make this

11   presentation to the strategy committee of the board of the

12   directors.

13          In doing so, one of these slides shows that Ansys

14   is looking at its competition.  We have blurred out, because

15   we do consider this to be trade secret information, Your

16   Honor, the specifics of the different competitors and also of

17   the, you know, win-loss rate against these competitors.

18   However, Autodesk is among these competitors.  And specific

19   within that is the win-and-loss rate.  How many times did

20   Autodesk go head-to-head in competition against Ansys and

21   either gets the customer or not.

22          THE COURT:  Okay.  You have five more minutes.

23          MS. TUITE:  Thank you, Your Honor.

24          So, needless to say, we submit, and it's detailed

25   more in our affidavits, as to the breadth of the trade secret

1    information that he had at his fingertips.

2              In terms of irreparable harm, Your Honor, this next

3    slide goes to the individuals that we are aware from our

4    preliminary look that have been recruited by Autodesk.

5    Another one of the key issues in this case, Your Honor, is

6    going to hinge upon the fact that, you know, Ansys is,

7    Autodesk is trying to get to the same level as Ansys is in

8    selling simulation software.

9              THE COURT:  Are you saying these three people, these

10   three additional people have also been solicited?

11             MS. TUITE:  Yes, Your Honor.

12             THE COURT:  Have they moved?

13             MS. TUITE:  They have not.

14             THE COURT:  Who did the solicitation; do you know?

15             MS. TUITE:  It came from Autodesk.  The e-mail

16   indicated that it was an internal Autodesk recruiter.

17             THE COURT:  Mr. Fallon involved in that in any way?

18             MS. TUITE:  No, Your Honor.  I'm not aware

19   Mr. Fallon being aware of that.  Being involved in that.

20             THE COURT:  When did those solicitations occur?

21             MS. TUITE:  In June of this year, Your Honor, I'm

22   aware Mr. Fallon has received a renewed request from Autodesk.

23   I believe that it's also the same for, I know that it is the

24   same for Mr. Yap, and Mr. Gilmer, and Mr. Crinson (Spelled

25   phonetically.), I believe, were around that same time, June,

1   2014.

2            THE COURT:  Is there anything in your slides to be

3   considered confidential.

4            MS. TUITE:  No, Your Honor.

5            THE COURT:  We'll mark those, since I don't know

6   this and we'll get through all those in our argument, we'll

7   mark them as Plaintiff's Exhibit 1.

8            MS. TUITE:  Thank you, Your Honor.

9            The key here, Your Honor, is irreparable harm can be

10  shown in a number of ways.  One of the ways in which it can be

11  shown is through the use of confidential information.  While

12  from the information that we have been able to tell,

13  Mr. Fallon is going to be in a very high-level position, one

14  level removed from the CEO, at Autodesk, the same sort of role

15  that he had at Ansys.

16           Our understanding is that he is going to be using

17  those, the same sort of information and he would be able to

18  answer the type of questions that he would be asked in that

19  role such as what acquisition targets should we go after,

20  which market, would you go after China or would you go after

21  Japan, what products should we be focusing on.  Any time he

22  answers a question, there is a substantial threat that he is

23  going to be sharing Ansys information.  As through this role,

24  Your Honor hasn't stopped thinking like a lawyer or thinking

25  like a judge.  And that's something that he has been there for

1   eighteen years and has been so embedded in all this
2   information, regardless of whether or not he's taken anything.
3   And we're not saying he's taken anything, Your Honor.  He's
4   not going to be able to fulfill this role without irreparably
5   harming the company through use of its trade secret
6   information.
7           And these employees are all watching.  And that's
8   the other point for the irreparable harm, Your Honor.  The
9   state of the intellectual property, that the hundreds of
10  millions of dollars have been invested, is at issue.  And I
11  would just point out, I know Mr. Fallon has referred to
12  himself as a back office employee.  We're curious that in the
13  offer letter we are looking at here, it's an overall package
14  of approximately $1.1 million for a back office employee,
15  with him receiving a substantial increase in terms of his
16  compensation up to two hundred five thousand dollars, the
17  incentives, the stock, the relocation, the twenty-five
18  thousand dollars signing bonus.
19          THE COURT:  Okay.  Let's stop.  Take a breath
20  please.
21          Now, have you downloaded his computer to search his
22  computer at work?
23          MS. TUITE:  We have had -- yes.  Your Honor, we've
24  done some of that.
25          THE COURT:  What did that show, show relating to his

leaving?

MS. TUITE:  That showed that there had been, I
believe, thirty-six different external devices that were
plugged into his computer.  It showed sixty-one documents
that he has last looked at.  And it also showed his Internet
searches where around August 13 he was, in fact, searching to
see whether or not non-competes are enforceable.

THE COURT:  Back to the thirty-six external devices,
You have an affidavit from him about that?

MS. TUITE:  Yes, Your Honor.  I believe that's
Exhibit C.

THE COURT:  Are you able to tell what information is
downloaded onto those?

MS. TUITE:  No, Your Honor.  We do not yet have
those external devices in hard drive.  Mr. Fallon has provided
his iPhone, which we have received today, and he had provided
one external hard drive, and I believe two floppy disks.  But
none of that was on the list.

THE COURT:  But you are saying there were thirty-six
different devices or there was thirty-six times in a certain
time period that an external device was used?

MS. TUITE:  I think thirty-six different devices,
Your Honor.

THE COURT:  And I can tell you that the device via,
it can read the devices --

1          MS. TUITE:  Yes, Your Honor.  As an exhibit to

2   Mr. Creasy's affidavit, there is a list of each one of those

3   devices that were submitted.

4          Now, Mr. Fallon had attended a, a four-day planning

5   meeting that was led by Josh Fredberg.  And so, at that

6   meeting in August, around the week of August 19, his computer

7   likely was used for some of the presentations.  That would

8   likely account for some of them during that four-day period.

9          But, at this point in time, Your Honor, we do not

10  have an accounting for where all of those devices are or if

11  Mr. Fallon has them.  But we are not stating today that he has

12  taken anything.  We believe that, certainly, based on the

13  likelihood of success, the irreparable harm that is at issue

14  here today, and also the fact that he knowingly made the

15  decision to go and leave, having weighed the consequences,

16  that public interest, and the harm that would be greater to

17  Ansys, outweighs any kind of harm to that which Mr. Fallon

18  claims.

19          THE COURT:  Thank you.

20          Ma'am.

21          MS. PERRELLI:  Thank you, Your Honor.  I just wanted

22  to take the last piece first.

23          THE COURT:  Excuse me.  Excuse the interruption.

24  The jury has a verdict.  So, I just need to get the lawyers

25  over here.  So, ma'am?

1          MS. PERRELLI:  Yes, Your Honor.  I just wanted to
2    address the last part.
3          THE COURT:  Just stay by the microphone because
4    that's tied to the speaker before the court reporter.  It
5    makes it easier for her to hear what's being said.
6          MS. PERRELLI:  Okay.  I just wanted to address the
7    access issues, Your Honor, first.
8          THE COURT:  Certainly.
9          MS. PERRELLI:  The last piece.  We got these
10   affidavits a couple of days ago or yesterday.  I haven't had
11   an opportunity for Mr. Fallon to respond or gotten his input.
12          I can tell you that just by looking at the dates,
13   all those dates occurred while he was still working for Ansys.
14   It wasn't right the date before he left.  There is no evidence
15   that he was downloading anything.  And it is, as counsel
16   pointed out, his computer was being used for this
17   presentation.  A lot of the people were downloading documents
18   because of the size of the documents for the presentation.
19   And the other USBs were being used during his time of work at
20   Ansys.  All the folks working there were using it for
21   documents to work on.
22          There is nothing, Your Honor, nefarious in this
23   report.  Certainly, we would have seen something if there was
24   anything nefarious about what Mr. Fallon was doing.
25          THE COURT:  As part of the your due diligence, have

1    you gone through or had some professional go to his home

2    computer and whatever, iPad, or anything else that he has?

3         MS. PERRELLI:  We are going to be imaging his

4    computer this weekend, Your Honor.

5         THE COURT:  Hasn't been done, yet?

6         MS. PERRELLI:  No.  It hasn't been done, yet.  No.

7         THE COURT:  Pick up whether anything's been deleted

8    and whether any other activity has been engaged in to indicate

9    anything?  Whether any of the deletions had been written over,

10   anything like that?

11        MS. PERRELLI:  We will be doing an imaging.  Imaging

12   Discovery is going to do the imaging.

13        THE COURT:  Thank you.

14        MS. PERRELLI:  You're welcome.  I should also point

15   out, his work laptop is back.  It was returned.  And we've had

16   an opportunity to examine that again.

17        THE COURT:  What do you mean, returned?  You mean,

18   he had it at his home and shipped it back?

19        MS. PERRELLI:  He returned it before he left work.

20        THE COURT:  And where was that kept?  Was that kept

21   in his home?

22        MS. PERRELLI:  I think he traveled with it and

23   worked with it, at home and at the office, as I understand.

24        THE COURT:  Thank you.

25        MS. PERRELLI:  You're welcome.

1          Just to address a couple things before we move into

2   the argument itself.  The slide that we saw here that was

3   blurred out due to confidential information, I would want to

4   just point out there were percentages and engagement rates in

5   terms of where the competitive market is.  We don't see that.

6   That would lead me really into the overall theme here, Your

7   Honor, is it's very easy to paint a very broad brush over

8   this, this industry.

9          And I want to take down a little bit of Mr. Fallon's

10  affidavit on what this industry really is like and the analogy

11  that was used in terms of like asking you not to think like a

12  lawyer.  That, in and of itself, shows the over-breadth of

13  what they're trying to do here.

14         This market is, they try to describe it as, you

15  know, the engineering software.  There are two pieces of this

16  market.  There's the CAD software and simulation software.

17  There's also -- come back to that.  There's also the relative

18  places that these two companies are in.  And as we point out

19  and Mr. Fallon points out in the affidavit, they're each at

20  opposite ends of the spectrum in those two areas.

21         Autodesk is a, predominantly, a CAD software

22  company.  That's where they made their mark, their money.

23  That's where their market prominence is.  They are one of

24  four, primarily, four market leaders in that area, which is

25  Sals System, Autodesk, as I mentioned, and CNC.  Ansys is not

1    in that market.  Apparently, relatively recently, having

2    acquired a company to start to get into that market, but

3    that's where they are.

4         Autodesk is prominently in CAD and Ansys has not

5    even started that.  On the simulation side, the Simulation

6    Software -- let me back up.  CAD Software, as I'm sure you are

7    familiar with, served in the 3D format.  Simulation Software,

8    in fact, is the provider where it can do what it's intended to

9    do and allow the engineers to work with the product, work with

10   the software, to test, see if it's living up to what it's

11   supposed to do.  And that's Ansys' business.  They are a

12   market leader in that, for sure.

13        Autodesk does have simulation products.  We lay this

14   all out in Mr. Fallon's affidavit, as well.  They are in terms

15   of market space and strength at a very low level as compared

16   to Ansys and particular products, which are four or five at

17   that or at a level of assumptionality.  The products are

18   dramatically different than Ansys has made in its stock and

19   trade.  So, it's sort of the scales of justice, they are at

20   either end in each of these areas.

21        And Mr. Fallon's role, again, keys to the kingdom is

22   almost an amusing phrase in this context.  He was a marketing

23   person, Your Honor.  He was not a product person.  He was not

24   writing code.  The back office reference was not in respect to

25   his job at, his intended job at Autodesk.  It was a reference

to his job at Ansys.  He was a back office.  He played a back office function.  He had a very small marketing team who worked with product planners, who had the detail and knowledge about the specific product he was dealing with at Ansys.  He was not the product person.  He was the marketing guy. Marketing strategies that work for Ansys are not going to work for Autodesk.  They're in very different places in the market.

Autodesk trying to get into the development of products.  Sure.  We don't back away from what the 10(c) says. It's one of the many competitors in a very broad and very wide market across the various CAD areas, as well as simulation areas.  So, this is a very, very broad brush, Your Honor.

The customer base of the two companies.  Ansys is, you know, customer base is some of the world's largest and most innovative companies.  Autodesk is a mid-market, has a small company customer base.

The networks by which they sell are very different. Autodesk sells to resellers and Ansys, not the case. Moreover, Mr. Fallon was not customer basing.  He's not a sales guy.  He wasn't out developing customers.  There was no threat of bringing customers to Autodesk.  Customer bases are different and have a different approach than Ansys customer base.  With an Autodesk simulation product, they would have nothing to talk about, Your Honor.

So, it's just a very, very different market.  It's

1    tough to demonstrate that in a fifteen-minute argument, but

2    if you read Mr. Fallon's affidavit, which I know you will, he

3    lays out various differences between those two.  The areas

4    most telling is, are some of the statements that Mr. Fallon

5    has made in his affidavit, how Ansys knew about Autodesk, knew

6    they were a viable competitor.  We've seen the slide about

7    them being on the list of possible competitors, but we don't

8    see anything about where the percentages are, of course.

9         But Mr. Fallon testified that, in his affidavit,

10   he's had conversations with Mr. Fredberg, who is here today

11   and submitted an affidavit, who is his boss.  Mr. Yap, who was

12   a co-worker, about Autodesk's relative placement in the

13   markets versus Ansys.  Those folks did not -- Mr. Fredberg did

14   view Autodesk as a true competitor.  Mr. Yap didn't.  And you,

15   know, in the supplemental affidavit from Mr. Fredberg, there

16   was no, no, that was not addressed at all.  It was

17   conveniently not addressed at all.

18        So, I think, Your Honor, if you look at the

19   affidavids in here, you can make a quick analysis as to where

20   these companies are.  They are not direct competitors.  Is

21   there overlap?  Of course, there is, at very different places

22   in the market and their focus.

23        THE COURT:  You have five minutes, ma'am.

24        MS. PERRELLI:  Thank you.

25        Couple of other things that I wanted to mention,

 1    Your Honor, just on the non-compete itself and the language.

 2            THE COURT:  Please.

 3            MS. PERRELLI:  What strikes me as very odd about

 4    this agreement, and sort of, I think, puts the notion that,

 5    that Ansys is trying to protect confidential information, and

 6    goodwill, and customer relationships, that that's the business

 7    interest that's protected by this agreement.

 8            The language in Section 7 of the non-compete

 9    specifically says the provisions won't apply in the case of a

10    reduction in force.  Now, I realize the statements are an

11    equitable perspective when you look at a reduction in force

12    and determine whether it's equitable to enforce that

13    particular non-compete.  But to have a provision here that

14    says that provision of this particular section does not apply,

15    to me it shows that there is not a real respect for what

16    they're trying to protect.

17            THE COURT:  I think that's a function, as a ruling

18    of the Supreme Court.

19            MS. PERRELLI:  May be, Your Honor, but --

20            THE COURT:  For your information.

21            MS. PERRELLI:  The other point I want to make,

22    Your Honor, in terms of over-breadth and inevitable

23    disclosure.  There is a decision in the District Court, U.S.

24    District Court of New Hampshire, which was affirmed by the

25    First Circuit, which involved Ansys and an employee who went

1    to one of the biggest competitors, if not the biggest, in the

2    simulation market called CDF Co. (Spelled phonetically.), in

3    which a code writer, an actual person building, writing code

4    and working with the products, went to this, went to the

5    competitor.  Ansys sued and the Court in New Hampshire had

6    found that they had not demonstrated that there was a

7    likelihood of inevitable disclosure.

8          That's direct in a technical area position, unlike

9    Mr. Fallon who is big picture marketing strategy.  We cite

10   this in our brief, Your Honor, but also took into account the

11   very strict requirements that the new employer had in place,

12   that they did not want confidential information.  They weren't

13   interested in it.  They confirmed that they weren't going to

14   use it.  And they lost that case, Your Honor.  It was a

15   position of someone writing code, that was not viewed to be

16   a competitive threat because there wasn't an inevitable

17   disclosure.  This is even further removed, Your Honor.

18         In terms of irreparable harm, Your Honor, I don't

19   think a demonstration has been made here that irreparable harm

20   is going to issue to or result to Ansys.  There's been no

21   demonstration that Mr. Fallon has taken information, and has

22   any intention of using it, that any information would be

23   relevant to Autodesk.  They've made it very clear they don't

24   want it.  And if this restriction is applied as written, Your

25   Honor, Mr. Fallon is not going to be able to find a job in

1    this very particular, very broad industry he's been in for

2    seventeen years.  He is the sole bread-winner in his family,

3    one of whom is on her way to college in the next few years.

4    He's going to be in a position where, even though he's paid

5    for a period of time, he's getting just one-third of his

6    salary.  When you consider benefits and stock options --

7            THE COURT:  I understand that.

8            MS. PERRELLI:  If he's out for the year, he's being

9    paid half his salary for that period of time.  There is no

10   salary.  There is the no stock options that he had access to

11   and would not be investing.  And when you calculate all of

12   that out, Your Honor, it's about thirty percent of what he

13   would get on a full-time basis.

14           THE COURT:  Thank you.  Thank you to both of you.

15           I realize this is important to everyone.  So,

16   fifteen minutes doesn't sound like enough time.  So, but I do

17   have a little knowledge of this area.  So, let's talk about

18   the path forward.

19           I would like to conduct the permanent injunction

20   hearing on November 12.  So if you could get your calendars

21   out?  We're going to start working the calendars, if you would

22   work with me please.  November 12.

23           MS. TUITE:  Your Honor, we did speak very closely in

24   terms of our schedules and the planning.  And, certainly, if

25   we need to do it on the twelfth, we will make that occur.  But

1    we were looking for November for a little bit of extra time.

2           MS. SALVATORE:   Your Honor, we do have a proposed

3    joint scheduling order that I believe --

4           THE COURT:   No one mentioned that.

5           MS. SALVATORE:   It's being presented to you right

6    now, Your Honor.   That we would request that you consider.

7           THE COURT:   The parties have worked out dates with

8    respect to depositions, 30(b)(6) depositions.   When would we

9    have the trial, then?

10          MS. TUITE:   November 24 and 25, Your Honor.

11          THE COURT:   Thanksgiving week?

12          MS. TUITE:   Before Thanksgiving, Your Honor.

13          THE COURT:   No.   It's Thanksgiving week.   What do

14   you mean, it's before Thanksgiving?   It's Thanksgiving week.

15   It's when the grandkids come in.   I mean, geez.   I was willing

16   to work Thanksgiving week when I was getting the big bucks you

17   all get, but that's not the case, anymore.

18          MS. PERRELLI:   We tried to work with each other,

19   Your Honor.

20          THE COURT:   I appreciate that.

21          MS. PERRELLI:   But, Your Honor, frankly, I said,

22   and this is not news to Ansys counsel.   We would like the

23   hearing sooner.   If it requires us to work further and work

24   more days, we are willing to do that.

25          THE COURT:   So, I can give you a day, and the reason

1   why we can do this in a day is that for my injunction hearings

2   I accept the affidavits as the direct evidence and we then

3   have the hearing on cross, because there is no reason to have

4   affidavits and have people get on the stand and do direct and

5   just repeat the affidavits.

6          So, what would happen is the plaintiff would put a

7   witness on the stand as direct.  They would offer as direct an

8   affidavit.  You would immediately cross.  So, we wouldn't

9   have, we wouldn't have any direct testimony.  Obviously, if

10  you wanted the defendant to do some direct, and that's fine,

11  because I want to respect his rights.  But that's how we

12  generally do an injunction hearing.

13         Yes, ma'am.

14         MS. PERRELLI:  We have a number of additional folks

15  that we intend to discover, so we would submit their evidence

16  by affidavits, as well.

17         THE COURT:  Whatever you want on direct.  And then,

18  then we would just do cross.  It's just not a wise use of time

19  to have people get on the stand and repeat their direct, which

20  a few good lawyers like you two, four, would just repeat the

21  affidavit.  So, that's how we conduct that.

22         Now, do you think any way you would still need two

23  days?  Is that what you would still think on that basis, a day

24  and a half?  Because I can give you some time on the

25  thirteenth, but I have a speech I need to give from about

1   eleven to noon-ish.  So, I can give you the morning and a
2   little bit after that.
3            MS. TUITE:  I'll be with you, Your Honor.
4            THE COURT:  Yes.  I know that.
5            MS. PERRELLI:  Your Honor, a day would be fine.  If
6   there was some suggestion that Autodesk might be brought into
7   that, there is consideration for that.  So, it might require
8   more than a day hearing, if that's the case.
9            THE COURT:  Well, if that happens, I don't want to
10  put you in a conflict situation.  I realize you're not there,
11  yet.  But that can always happen with individuals.  At least,
12  that's been my experience.
13           And the eleventh, just for your information, is
14  Veterans' Day.  Unlike Thanksgiving, the courthouse won't be
15  open.  We can't be here without security.  I think you all can
16  talk about it.  If it turns out you need two days, maybe we're
17  going to have to start on the tenth, even though I do have
18  some criminal matters on that day.
19           Why don't we see if we can't do it on the twelfth
20  and, if necessary, a little bit on the thirteenth?  I mean,
21  because you can focus in on, I think, both, all four of you
22  are really sophisticated, you can focus on where the overlap
23  is.  We also want to hear what are the firewalls in place and
24  does Ansys, does Autodesk, want him, want some money to make
25  sure he's honoring the firewalls.  There is a lot of

1    complications that happened in this case.

2         So, I'm, I would like to do it on the twelfth and

3    that's within, less than eight weeks from today, because I

4    think a decision's important.  And so, he can plan his life

5    and both employers can plan their case.  Where do you fly out

6    of, ma'am?  What airport?

7         MS. PERRELLI:  Logan.

8         THE COURT:  How are the flights?  Can you get

9    direct?

10        MS. PERRELLI:  Yes.

11        THE COURT:  We'll do the pretrial conference on the

12   seventh of November.  Are we going to need a preliminary

13   pretrial conference or not?  Are you guys going to play well

14   so we don't need it?

15        MS. TUITE:  Your Honor, I don't think you need one.

16        THE COURT:  Just so it's clear.  To the extent that

17   there are un-objected to exhibits, they should be marked as

18   Joint Exhibit 1, 2, 3, whatever.  And then any plaintiff

19   exhibits that are objected to can be marked as P1, whatever.

20   Any defendant's exhibit that's objected to is D2.  So, when

21   I look at the exhibit list, I know what are the objected to

22   documents, if any.  It also eliminates the plaintiff and

23   defendant each having the same exhibit marked with different

24   numbers.

25        Yes?

1          MS. TUITE:  Your Honor, would it be possible to have

2     a pretrial conference earlier of that week?

3          THE COURT:  Earlier?

4          MS. TUITE:  Yes, Your Honor.  I'm supposed to be out

5     of town on the seventh.

6          THE COURT:  We'll do it on October 31.  Does that

7     work for you, ma'am?

8          MS. TUITE:  Yes.  Thank you, Your Honor.

9          THE COURT:  Now, that's just going to collapse your

10     days down, just so you understand.  And I'll fill out the rest

11     of the chart after that.

12          MS. PERRELLI:  Your Honor, we did agree to a

13     mediation date in the middle of this month, on the fifteenth,

14     October 15.

15          THE COURT:  Okay.  You can send me an ADR

16     stipulation, joint.

17          MS. PERRELLI:  We have that.

18          THE COURT:  Who did you choose to mediate?

19          MS. PERRELLI:  David White, Your Honor.

20          THE COURT:  Good choice.  Any objection to this

21     conference counting as the initial case management conference,

22     unless you want to fly back down here?

23          MS. TUITE:  No.

24          MS. PERRELLI:  No.

25          THE COURT:  With everyone in agreement, this would

1   be.   Okay.   Why don't we take a moment.   You go talk to your

2   client and see whether he would like to agree to not start his

3   employment until after the hearing on the permanent injunction

4   in return for his salary and benefits at Ansys continuing?

5   Would you like to have that conversation?

6            MS. PERRELLI:  We would, Your Honor.

7            THE COURT:  I'm not talking about the bonus or

8   anything.   This is the day-to-day check, medical insurance.

9   I want to make sure the family's covered and everything's in

10  place.   So, if you want to have that chat?

11           I want to make it really clear.   We're talking about

12  the regular pay check.   Is there anything else, other than the

13  pay check?   Talk to your clients.   If you don't, then, I'm

14  happy, I'm willing to rule.   I just thought that in light of

15  we're talking eight weeks or so, I doubt if he wants to move

16  his family across the country with the vagaries of how this is

17  going to turn out.   Is that fair?

18           MS. PERRELLI:  That's fair.   Appreciate that.

19           THE COURT:  Off the record.

20           (Whereupon, an off-the-record discussion was had.)

21           THE COURT:  Yes, ma'am.

22           MS. PERRELLI:  Your Honor, based -- back up.

23           Mr. Fallon is agreeable to what you suggested, not

24  starting until after the preliminary injunction hearing on the

25  condition that he is going to be made, paid a salary and

1   benefits during that time.

2         THE COURT:  It's going to be a permanent injunction

3   hearing.

4         MS. PERRELLI:  I understand.

5         THE COURT:  And so, is there any -- I want to make

6   sure we've got salary, we've got benefits.  There is nothing

7   else that we're going to have a dispute over, well, I thought

8   I was going to get my commission.  Anything else?  Salary,

9   benefits.

10        MS. PERRELLI:  Salary, benefits.

11        THE COURT:  Able to do that?

12        MS. TUITE:  Your Honor, we come today with a check

13   prepared to provide five thousand dollars, which would be the

14   first payment, which would be pursuant to the agreement.

15        THE COURT:  No.  Okay?

16        MS. TUITE:  Thank you, Your Honor.

17        THE COURT:  We're not going -- that would force me

18   to judge the enforceability of the agreement.  What we're

19   doing is having a standstill agreement.  And you may have to

20   do some paperwork to get him back on the payroll.  But if you

21   don't want that, then I'm not going, we're not going to,

22   obviously, have a consent preliminary injunction.  So, you

23   want to go back, talk to your client, see whether they're

24   going to put him back on the payroll or let him roam free?

25        MS. TUITE:  If I could just confer one moment,

1  Your Honor?

2       THE COURT:  Sure.

3       (Whereupon, an off-the-record discussion was had.)

4       MS. TUITE:  Your Honor, they're willing to make sure

5  that he receives the payment, although, he is not an employee.

6  He, technically, will not be on the employee rolls.  He will

7  be paid under, to the extent it is, under the law.  He is not

8  able to go back on the benefits.  It will, will just get

9  conducted in that manner.  He'll get the same net benefit.

10      THE COURT:  But you are somehow taking care of his

11 medical issues, health care?

12      MS. TUITE:  Yes, Your Honor.

13      THE COURT:  Okay?  I know there is some logistics,

14 but if someone needs to pay COBRA, then the plaintiff has to

15 pay the COBRA.  So, we just have to make sure.  How long does

16 COBRA last for?

17      MS. TUITE:  Eighteen months, Your Honor.

18      THE COURT:  We got plenty of time, then.  Then the

19 two of you should work out a, agree to preliminary, agree to a

20 preliminary injunction.  I hope that you all play nice with

21 each other, because you have so far, so there is no dispute on

22 what those terms would be.

23      Yes, ma'am.

24      MS. TUITE:  In terms of what you are specifically

25 looking for, Your Honor.  This is strictly the restriction

1    that would be on Mr. Fallon for this time frame.

2            THE COURT:  Sure.  He's going to honor the terms of

3    the agreement without waiving his right to challenge the

4    enforceability of it.

5            MS. TUITE:  Thank you, Your Honor.

6            THE COURT:  So, he's not abandoning any defense or

7    anything.  We are just all going to stay in place.  And the

8    benefit he gets is the continued salary and health and other

9    benefits.  I appreciate there may be some 401K matching that

10   can't occur because he is not employed.  We have certain ERISA

11   and other issues.  I think, provisionally, you all could work

12   through that together.  He can enjoy the fall in New

13   Hampshire, which life could be worse.

14           Anything else you would like to talk about this fine

15   day?

16           MS. TUITE:  No.  Thank you, Your Honor.

17           MS. PERRELLI:  No, Your Honor.

18           THE COURT:  Do you really envision expert reports?

19           MS. PERRELLI:  Yes.

20           THE COURT:  On what?  Okay.  On the industry?

21           MS. PERRELLI:  Perhaps.

22           THE COURT:  Okay.

23           MS. PERRELLI:  Depending upon how fact discovery

24   goes.

25           THE COURT:  Okay.  Watch your dates, because you're

1  going to have sort of, you're going to have discovery and

2  pretrial dates working simultaneous with the trial date.  So,

3  I'll do my best to give you as much, as much time without

4  jamming us up.

5         Anything else you would like to talk about this fine

6  day in the 'Burg?  What time's your flight back home?

7         MS. PERRELLI:  I think it's 4:30 flight.

8         THE COURT:  Fly commercial or not?

9         MS. PERRELLI:  Yes.  Definitely; yes.

10        THE COURT:  Sorry to hear that.  Have a good

11 weekend.

12        MS. PERRELLI:  Thank you very much.

13        MS. TUITE:  Thank you, Your Honor.

14        MS. KRINGS:  Court is adjourned.

15        (Whereupon, court was adjourned on the twenty-sixth

16 day of September, 2014.)

17                      - - -

18                C E R T I F I C A T E

19        I certify by my original signature herein that the

20 foregoing is a correct transcript from the record of

21 proceedings in the above-entitled matter.

22

23
                         s/Sandra Wenger, FCRR, RMR
24                       Official Court Reporter
                         DATED: October 20, 2014
25        *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****